IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

      Plaintiff,

    vs.

WAYNE OTTEY,

      Defendant.

Criminal Action

No. 00-186

Transcript of proceedings on Friday, February 9th, 2007, United States District Court, Pittsburgh, Pennsylvania, before Judge Lisa Pupo Lenihan, U.S. District Court, Magistrate Judge.

APPEARANCES:

For the Government:     GREGORY NESCOTT, Esq.

For the Defendant:     MARTIN DIETZ, Esq.
                   ALAN SOVEN, Esq.

Court Reporter:      Shirley Ann Hall, RDR, CRR
                  619 U.S. Courthouse
                  Pittsburgh, PA 15219
                  (412) 765-0408

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

EXHIBIT
G

2

```
 1                      P R O C E E D I N G S
 2                          *  *  *  *  *
 3              (In open court.)
 4              THE COURT:  Good morning.
 5              ALL COUNSEL:  Good morning.
 6              THE COURT:  We're here in the case of the
 7    United States of America versus Wayne Ottey, Case No. 00-186.
 8              Mr. Gregory Nescott is representing the Government
 9    and I'm not really sure who is representing the Defendant.
10              MR. DIETZ:  Your Honor, Martin Dietz here today.
11    I'm here as local counsel.  I've entered an appearance in that
12    regard, and it's still an appearance, Judge.  I'm here today;
13    but if the Court would be so willing to indulge me, I would
14    like at this time to move for the admission of attorney
15    Alan Soven from Miami, Florida, who will -- has indicated to
16    me that he's willing to enter an appearance on behalf of
17    Mr. Ottey, and he would be the one that would be conducting
18    the proceedings today on behalf of the Defendant.
19              THE COURT:  Okay.  That's fine with me, Mr. Soven,
20    if you conduct the proceedings; and I'll be happy to admit you
21    for purposes of this hearing.  I'm not sure that I have the
22    authority to admit anyone pro hac vice, but you can file a
23    motion to that effect with the court.  But for today you're
24    admitted and you can represent Mr. Ottey.
25              MR. SOVEN:  Thank you; good morning.
```

3

1              THE COURT:  Good morning.

2          We're first going to do an arraignment in this case.

3          Mr. Soven, has your client received the indictment

4   and would you like me to review it with him?

5              MR. SOVEN:  He has received the indictment.  I have

6   gone over it with him, and he will waive formal reading.

7              THE COURT:  And how does he plead?

8              MR. SOVEN:  He has already executed a plea of not

9   guilty, which I -- if I may approach and pass this up to the

10  clerk.

11             THE COURT:  Sure.

12             MR. SOVEN:  The dilemma is I'm not moving for

13  permanent appearance, and I don't know by signing the

14  arraignment if I'm now officially in, so I would ask not to be

15  officially in, that I be allowed just to have a limited

16  appearance for purposes just of today's hearing.

17             I only met him just an hour ago for the first time.

18  I flew in from Miami, so I haven't had time at all to even

19  discuss what the case is about, what my fee would be, if I'm

20  going to be retained; so that's the dilemma I'm faced with.

21             THE COURT:  You flew all the way up here without

22  ironing all those things out?  You just love the snow, is that

23  it?

24             MR. SOVEN:  I've never been to Pittsburgh, and I

25  wanted to be here.

4

1          THE COURT:  You know, I don't know how -- now that

2   you've signed the document --

3          MR. SOVEN:  I have not yet signed it.

4          THE COURT:  I'm thinking maybe Mr. Dietz should sign

5   it since you're counsel of record.

6          MR. DIETZ:  Judge, I don't have an objection about

7   doing that.  I spoke to Mr. Ottey about that.

8          THE COURT:  That would make more sense at this

9   point.

10         The other thing was I'm not remembering, Mr. Ottey,

11  when we had our first hearing -- I'm sure that I asked if you

12  wanted court-appointed counsel; and so depending on your

13  financial situation, if you don't retain Mr. Soven, that's

14  something that we can explore at some point.

15         MR. SOVEN:  Very good.

16         THE COURT:  All right?

17         MR. SOVEN:  Thank you.

18         THE COURT:  All right.  We will enter the not guilty

19  plea for Mr. Ottey.

20         The case has been assigned to Terrence McVerry.

21  Please be advised that all pretrial motions must be filed

22  within ten days of today's date and any motions for extension

23  must be presented to Judge McVerry within the ten-day period.

24         Mr. Nescott, can you tell us the state of discovery?

25         MR. NESCOTT:  Your Honor, I've provided the defense

5

```
1   with the discovery that's available, and there's a lab report
2   out of Washington that isn't in my file; we'll track that down
3   and get it to him very shortly.  I've advised counsel of that.
4   But beyond that, pretty much everything required under Rule 16
5   has been provided.
6             THE COURT:  And how much time do you think you'll
7   need for trial?
8             MR. NESCOTT:  Two weeks, Your Honor.
9             THE COURT:  Okay.  Mr. Soven, do you have any
10  discovery issues you'd like to raise today?
11            MR. SOVEN:  I do not.
12            THE COURT:  All right.  How much time do you think
13  you'll need for trial?  It's an estimate, the purpose of which
14  is so that Judge McVerry can make the appropriate time
15  available on his calendar.  I know it's hard to say at this
16  point, but --
17            MR. SOVEN:  After the Government puts on their case,
18  at best, two, three days.
19            THE COURT:  Okay, we'll note that.
20            There's also been a request for detention made by
21  the Government.  Are we prepared to proceed with a hearing on
22  that today?
23            MR. NESCOTT:  The Government is, Your Honor.
24            THE COURT:  Defense?
25            MR. SOVEN:  We're ready.
```

6

1          THE COURT:  Okay.  Do we need a court reporter?

2          Oh, I see Shirley; you're hiding.

3          All right.  Mr. Nescott, you may proceed.

4          MR. NESCOTT:  Your Honor, the Government intends to

5   proceed by proffer of the witness, and then we'll make that

6   witness available for cross examination by defense.

7          The witness is Kevin O'Donnell, a Special Agent with

8   the IRS for the past nineteen-plus years; and Mr. O'Donnell

9   would testify as to the various factors involved in the

10  detention consideration.

11          First, as to the strength of the case and the nature

12  of the charges, he would testify that the evidence in this

13  case would show that there was a cocaine -- crack cocaine

14  conspiracy existing between 1989 and January of 2000, with

15  cocaine being distributed by the kilos into the western

16  district of Pennsylvania from California and other locations

17  during that period of time; and Wayne Ottey's role was the

18  organizer of this conspiracy.

19          Particularly, Mr. O'Donnell would testify that a

20  series of witnesses have made statements or spoken with him or

21  testified before the Grand Jury; and just as to a couple of

22  these witnesses for purposes of this proceeding, Mr. O'Donnell

23  would testify that Witness No. 11 -- or W-11 -- would testify

24  or has stated that by 1999 this witness had been transporting

25  cocaine from California into this district for an associate of

1    Mr. Ottey's; and in November of 1999 Mr. Ottey came to W-11

2    and asked her to transport cocaine for him from California to

3    western Pennsylvania.

4        She agreed to do so, and she saw -- before she began

5    transporting for him in November of '99, she was at a home in

6    Oakland, California, which has since been identified, where

7    Mr. Ottey had multiple kilos of cocaine; and he was breaking

8    them apart and wrapping them in peanut butter and pepper and

9    other things that would mask the odor from drug dogs, and he

10   then packaged them up and put them in suitcases.  Again, this

11   was before this witness started making trips for him.

12       And once she agreed on the third -- on the 20th of

13   November of 1999, Mr. Ottey had this witness go to a residence

14   in New York -- in Washington, D.C. on West 57th Street.  There

15   they met, and then Mr. Ottey, traveling under the name of

16   Brandant, B-R-A-N-D-A-N-T, Green traveled with W-11 to

17   Oakland, California, to pick up kilos of cocaine.

18       They stayed at a Comfort Inn in Oakland, California;

19   and the witness and Mr. Ottey went to this home in Oakland,

20   picked up and wrapped up five kilos of cocaine, disguising the

21   odor again and wrapping it in blankets, putting it in a

22   suitcase; and then W-11 and Mr. Ottey got on a plane and

23   headed back to Baltimore en route to Pittsburgh.

24       On the 23rd of November the two of them flew back

25   again, again Mr. Ottey using the name of Brandant Green, not

8

1   his own name, flew back into Baltimore/Washington

2   International Airport.  And the following day these two and

3   another individual drove back to Pittsburgh, to a house in

4   Penn Hills.

5         Mr. Ottey advised W-11 that he was a cocaine

6   wholesaler, and he traveled to Pittsburgh about one time a

7   week to distribute his cocaine here.

8         W-11 also has told Mr. O'Donnell that on the fifth

9   of December she traveled back to the D.C. residence and met

10  with Mr. Ottey.  They were to make another trip to California.

11  Mr. Ottey described this residence to her as a safe house.  He

12  also told her in December of '99 that the IRS was snooping

13  around, they were looking at him, that he had lost a hundred

14  thousand dollars at JFK Airport in October of 1999, and that

15  he was going to be going to England.  He also indicated that

16  his wife's house -- his common law wife's house was not safe

17  for him at that point.

18        The witness and Mr. Ottey then traveled back to

19  Oakland, California, by air on December the 5th -- again,

20  Ottey traveling as Brandant Green -- stayed at the Comfort

21  Inn, picked up another five kilograms of cocaine which was

22  also repackaged, put in a suitcase, and on the 8th of

23  December W-11 and Ottey traveled back to BWI Airport.

24        When the witness went to get the bag, Ottey went to

25  get the car.  She grabbed the bag, appeared at the curb, and

9

1  approached the car, where Mr. Ottey, his cousin Clyde Ottey,

2  and another individual were.  As she approached the car,

3  agents approached her.  The agents noticed these three men in

4  the car.  Clyde Ottey got into the back seat of the car and

5  the car fled from the scene.  The agents approached the woman,

6  eventually opened the bag, and found five kilos of cocaine

7  inside the bag.

8          The corroboration in this case of what W-11 has said

9  consists, among other things, of the five kilos seized by the

10  agents, the fact that Southwest Airline's records confirm

11  November and December trips by Brandant Green traveling on the

12  same flight with W-11 under her real name; the records also

13  confirm eight trips in 1999 by Wayne Ottey under his name or

14  by Brandant Green, all from Baltimore/Washington to Oakland,

15  California, and back.

16          Also corroborating this there are records from the

17  Comfort Inn in Oakland, California, where W-11 said they had

18  stayed.  Those records show the rooms were rented on these

19  particular dates when these trips were made -- actually on

20  three separate trips in November and December of 1999.  The

21  rooms were all rented under the name of Brandant Green; and

22  the person registering as Brandant Green, the driver's license

23  name -- Illinois driver's license was written on the invoices.

24          The agents have tracked that Illinois driver's

25  license, and they found -- and I'll show it to the Court in a

10

1    minute -- a driver's license photo that appears to be

2    Wayne Ottey and other witnesses have identified as Wayne Ottey

3    under the name of Brandant Green, Chicago, Illinois.

4            Briefly, as to the strength of the case, Your Honor,

5    the -- after the December, 1999, arrest of the courier in the

6    Baltimore/Washington Airport, Wayne Ottey dropped from sight

7    for purposes of law enforcement.  INS and Customs records were

8    checked because Mr. O'Donnell will testify that those records

9    show the entry of all individuals back into the United States

10   or into Canada, where they could come into the United States;

11   they're kept, computerized records.

12           The last entry shown in the records is an entry for

13   Wayne Ottey into Toronto in 1997, and there is no entry

14   indicating that he has traveled abroad since that time, at

15   least under the name Wayne Ottey.

16           Further, a witness, W-14, identified photos of

17   Wayne Ottey who -- and also knew Wayne Ottey as

18   Brandant Green.  According to this W-14, the witness was

19   present at least ten times when Wayne Ottey was in the home in

20   Oakland, California, a residence identified on McArthur

21   Boulevard.  The witness was present when Wayne Ottey

22   re-packaged cocaine kilos into suitcases and used couriers to

23   take them from California.

24           At least one time the witness helped Wayne Ottey

25   count about $36,000 cash out.

1    And this witness -- W-16, another witness, said that

2    Ottey had kept the gun -- brought a gun and kept the gun at

3    the McArthur Road location in Oakland.  And corroboration of

4    some of the things that this witness told the agents, the

5    agents did a trash pull at the McArthur Drive home on

6    January 4th of 2000, a few weeks after the courier was

7    arrested, and they found five empty kilo wrappers in the trash

8    and other paraphernalia.

9    Sometime thereafter they did a search of that home

10   and also on the car belonging to the resident of that home, a

11   woman named Dorothy Gay.  Inside the home they found $112,000

12   in cash -- inside the car, rather; inside the home they found

13   other items of interest.

14   Four other witnesses I'll mention briefly,

15   Your Honor, as to Mr. O'Donnell's testimony.  Witness 6 will

16   testify -- has stated and/or testified that he was selling

17   crack and cocaine for Wayne Ottey for years, beginning as far

18   back as 1989; that he sent an estimated hundred thousand

19   dollars in wire transfers through Western Union in payment for

20   drugs to Wayne Ottey and to Clyde Ottey over this period of

21   time.

22   Witness 7 would testify that in the mid '90s

23   Wayne Ottey distributed kilograms of cocaine to this

24   individual in the western district of Pennsylvania on at least

25   three occasions.

12

1          W-16, who identified photos of Wayne Ottey and also

2    knew Wayne Ottey using the alias Brandant Green, would testify

3    that the witness saw credit cards in the name of

4    Brandant Green in Mr. Ottey's possession; and the witness also

5    saw Wayne Ottey with a kilogram of cocaine in California in

6    May of 1999.

7          And, finally, Witness 18 has stated that the witness

8    saw Ottey wrap fifty to a hundred thousand dollars up and

9    package it up to be sent out to California; saw him do this at

10   least two times a month for a period of some time, and that

11   was in 1995, '96.

12         And this witness also told officers in November of

13   2002, once they were inquiring about the whereabouts of

14   Wayne Ottey, since he had been indicted by that point, the

15   witness told the officers that the witness had personally

16   counted fifty thousand dollars out for Ottey, and that Ottey

17   had been in Miami a week earlier, but was believed to be back

18   in England at that point, in 2002.

19         The last part of the proffer as to Mr. O'Donnell,

20   Your Honor -- I'm sorry, that last Witness 16 also told the

21   agents that Wayne Ottey was presently known in 2002 to be

22   using disguised, false IDs, and false passports in his travel.

23         Lastly, Mr. O'Donnell would testify as to some of

24   the aspects of the risk of flight and history and

25   characteristics of Mr. Ottey.

13

1          Mr. O'Donnell has recovered photographs from

2    Western Union of various wire transfers, money orders being

3    sent by different individuals, including Wayne Ottey; and I've

4    given counsel copies of these.  And he also has retrieved the

5    Illinois driver's license that I'll present to the Court at

6    this time -- for purposes of this proceeding, we'd mark it as

7    Exhibit 1 -- a copy of an Illinois driver's license with a

8    photo license of Brandant Green.

9          It shows this license was applied for -- issue date

10   is 10-28-99 and shows Brandant A. Green, with an address of

11   Chicago, Illinois.  And that is -- this is an item that

12   Mr. O'Donnell would indicate that has been identified by

13   various individuals as being Wayne Ottey; and the picture is

14   there although it's not perfectly clear.

15         Mr. O'Donnell also has retrieved three other photos

16   of Mr. Ottey from Western Union here in Pittsburgh.  And the

17   first is a copy -- actually, the original -- sending money to

18   a woman by the name of Janeek McCutcheon, who is Mr. Ottey's

19   common-law wife, and it's sent by Wayne Ottey.  On this one he

20   used his name, Wayne Ottey; and there's a photo below.

21         On the second one, which would be Exhibit 3,

22   although marked Grand Jury Exhibit 1, it's money being sent by

23   Wayne Brown with a street address in Pittsburgh, and then

24   money being sent by Wayne McCutcheon with an address in

25   Maryland; and again the three photos of Mr. Ottey all appear

14

1    at the bottom of those send forms.

2            The last part of Mr. O'Donnell's testimony,

3    Your Honor, would relate to the fact that he has spoken

4    several times, and as recently as this morning, with an agent

5    with ICE in Pittsburgh who has reviewed the records, these

6    printouts, as far as when Mr. Ottey under the name of

7    Wayne Ottey would have traveled back into the United States,

8    and again it was confirmed this morning for Mr. O'Donnell that

9    the last time Mr. Ottey is listed as traveling into the

10   United States is 1997.

11           And I believe the Pretrial Services report indicates

12   Mr. Ottey said he was in England -- he had traveled as

13   recently as 1999, and then there is an issue of where he has

14   been since that time.

15           That would be Mr. O'Donnell's testimony in this

16   case, and he is available for cross examination.

17           THE COURT:  Thank you.

18           Mr. Soven, would you like to cross examine

19   Mr. O'Donnell?

20           MR. SOVEN:  Yes, Your Honor, if I may.

21           THE COURT:  Okay, Mr. O'Donnell.

22                        * * * * *

23           KEVIN O'DONNELL, a witness herein, having been first

24   duly sworn, was examined and testified as follows:

25                        DIRECT EXAMINATION

15

1          MR. SOVEN:  Would Your Honor like me to take the

2    podium?

3          THE COURT:  It's completely up to you, wherever

4    you're more comfortable.

5          MR. SOVEN:  Is it all right if I stand?

6          THE COURT:  That's fine.

7          MR. SOVEN:  Thank you, Your Honor.

8    BY MR. SOVEN:

9    Q.    Were you involved in the year 2000 in trying to locate

10   Mr. Ottey?

11   A.    Once Mr. Ottey -- once we had brought an indictment

12   against Mr. Ottey, we had input that information into

13   different indices like NCIC, and the Federal Bureau of

14   Investigation was taking the lead as far as covering leads as

15   to his whereabouts.

16   Q.    You had nothing to do with ascertaining the whereabouts

17   in the year 2000 of Mr. Ottey, is that correct?

18   A.    No, that is not correct.

19   Q.    Then tell me what efforts you personally made to find

20   Mr. Ottey in the year 2000 immediately after his indictment.

21   A.    We --

22   Q.    No, what you did, sir.

23   A.    We interviewed --

24   Q.    I'm sorry, I was just referring to you, not to we, just

25   to you.

16

1   A.     Okay.  As a matter of the task force which I was a part

2   of and had access to information, I personally contacted some

3   witnesses as to Mr. Ottey's whereabouts.  Specifically, in

4   2000, I'm not certain.  My recollection is not clear as to

5   exactly what dates they were contacted on.

6   Q.     Did you have any personal involvement in looking for

7   Mr. Ottey in the year 2001?

8   A.     No, I did not.

9   Q.     In the year 2002?

10  A.     I know there were.  Speaking of me personally, what

11  efforts I undertook individually, in 2002 we had traveled to

12  Maryland and were reviewing Western Union records that were

13  located at different locations, different Western Union

14  locations; and I know that we had driven by the Croaten Avenue

15  address, and I believe we had recorded some license plates and

16  things of that nature.

17         That's probably the extent of physically being in

18  Maryland, looking for Mr. Ottey.

19  Q.     You learned that he had, in the 1990s, owned a home at

20  5208 Croaten Place, Maryland, am I correct?

21  A.     Correct.

22  Q.     And that you learned that he had lived there with his

23  children's mother, a woman by the name -- a woman by the name

24  of Janeek McCutchery, am I correct?

25  A.     Janeek McCutcheon I believe is her name.

1   Q.    McCutcheon, yes, that was his children's mother.  She

2  lived at that home also, correct?

3  A.    We knew that she lived there.  I don't know if we

4  physically ever put him there.

5  Q.    Oh.  And you learned that, shortly after the indictment

6  and the warrant was issued, that Ms. McCutcheon was

7  interviewed, correct?

8  A.    I wasn't present.

9  Q.    Did you learn that?

10  A.    I don't have a recollection of that.  I know -- I can

11  tell you that the FBI agent was on our task force, sent out

12  leads to different offices for them -- tasking them to look

13  for Mr. Ottey.

14  Q.    Did you learn that the FBI went to the home at

15  5208 Croaten Place looking for Mr. Ottey?

16  A.    I knew that the FBI had conducted a search warrant at

17  that residence, but it was an unrelated investigation, and it

18  was not, my understanding, for the purpose of looking for

19  Mr. Ottey.

20  Q.    And you learned that the agents spoke to

21  Miss McCutcheon either at her place of work or at her home, am

22  I correct?

23  A.    Again, I did not -- I don't recall reviewing any

24  reports seeing Miss McCutcheon being interviewed.  I know that

25  leads were sent out to those resident offices by the FBI here.

18

1   And what the results of those were -- I don't have a

2   recollection of what the results of those leads were.

3   Q.     Well, did you learn from the FBI and other law

4   enforcement agencies that Ms. McCutcheon advised that

5   Wayne Ottey is living in England?  Is that true?

6   A.     We had information that he had -- was living in England

7   or has not -- I don't want to say living in England, but had

8   traveled to England; but my source of that information was not

9   Janeek McCutcheon.

10  Q.     All right.  So you knew he was a citizen of the

11  United Kingdom, am I correct?

12  A.     Yes.

13  Q.     And that he had a passport to the United Kingdom,

14  correct?

15  A.     I assume that he did.

16  Q.     All right.  So to determine whether he had left the

17  United States to travel to England, and since he was living in

18  the Baltimore area, did you check with the airlines in the

19  months of November, December of 2000 to see whether someone by

20  the name of Wayne Ottey had taken a plane and flown to

21  England?

22  A.     I had tasked the INS agent who was assigned to our case

23  and asked him to review or to send out a query for those types

24  of records.  And that query yielded a -- a number of -- I

25  thought they were all entry records of Mr. Ottey's travels

19

1    into the United States up through, I believe, like October of

2    '97.

3    Q.    And did you see that Mr. Ottey departed from Dulles

4    Airport, from Washington, D.C., in November of 1999 under his

5    name, Wayne Ottey, and flew to the United Kingdom, to London;

6    did you see that?

7    A.    I saw no such record.

8    Q.    Now, since you knew that he was a citizen there and

9    that he was in this country, you learned that he was in this

10   country on a green card, correct?

11   A.    That's correct.

12   Q.    That he was here legally in this country?

13   A.    That's correct.

14   Q.    And you learned that, through INS, that when he came to

15   this country to obtain his green card, the form he filled out

16   gave his address in England, which happened to be his mother's

17   address in Birmingham, Great Britain.  Birmingham, the City of

18   Birmingham, not London; you learned that, did you not?

19   A.    I believed it was his -- I thought it was his father's.

20   Q.    His mother's house.

21   A.    I believed it was his father's.

22   Q.    All right.  So you had an address in England, correct?

23   A.    Correct.

24   Q.    And when you had the address in England and you knew he

25   was a citizen of that country, did you make a phone call to

20

1    the authorities in England and say:  Can you drop by this

2    house, knock on the door, and see if Wayne Ottey is there?

3    Did you do that?

4    A.    We did a -- through the United States Marshals Service,

5    I provided them with all information, including that address.

6    And I didn't get back any positive response that they were

7    able to locate him there or if they made such a query; I'm not

8    aware of that.

9    Q.    Or if they even tried, you don't know?

10   A.    We didn't get any positive response.

11   Q.    So no one to your knowledge went to the house that is

12   owned by his mother, that he listed on his immigration form,

13   and knocked on the door and said:  Wayne Ottey, are you here?

14         Am I correct?  No one did that to your knowledge.

15   A.    We didn't get any positive response that he was at that

16   address.

17   Q.    Did you learn that Wayne Ottey was living at his

18   mother's house in Birmingham, had a telephone bill in his

19   name, a light bill in his name, an electric bill in his name,

20   and was getting a Government subsistence in his name?  Did you

21   know that?

22   A.    We had no information that he was residing there.

23   Q.    Did you look -- not you personally, did the

24   United States Government ask the British people to look, to

25   just check?

1   A.      Again, we had provided information to the United States

2   Marshals Service that that was a possible location where he

3   could be.  And I don't know what -- what leads that they

4   covered in trying to discover his whereabouts there.

5   Q.      Okay.  So if our Government or the British Government

6   dropped the ball, so be it.

7          Now, about two weeks ago Mr. Ottey was arrested, am I

8   correct?

9   A.      Yes.

10  Q.      He was arrested because he was a passenger in a car

11  that had been stopped for a traffic infraction, correct?

12  A.      He was -- he was --

13  Q.      He was a passenger in a car, right?

14  A.      He was a passenger in a car and was subsequently

15  arrested when he --

16  Q.      Let's not get ahead.

17  A.      Okay.

18  Q.      He was a passenger in a car?

19  A.      Yes.

20  Q.      The car was stopped.

21  A.      Yes.

22  Q.      Mr. Ottey was asked for his name and his address,

23  correct?

24  A.      I understand that's correct, yes.

25  Q.      And the name that he gave was Wayne Ottey when he

22

1    got -- when he was the passenger in the car, correct?

2    A.    Yes.

3    Q.    And he was then asked:  Do you have a middle name?  And

4    he gave the name Garfield, correct?

5    A.    I don't know that.

6    Q.    Oh, okay.  And he had on him no aliases and no

7    identification of any other people, correct?

8    A.    I don't know what -- that's correct.  There was no

9    identification -- I don't believe he had any identification.

10   Q.    He didn't have a phony passport or anything, any other

11   documents of some other person on him, is that correct?

12   A.    He didn't have any identification on his person from

13   what I understand.

14   Q.    But he freely gave his name, Wayne Ottey, correct?

15   A.    He told the officer his name was Wayne Ottey.

16   Q.    Okay.  And he had on him about $63 in cash?

17   A.    I'm unaware of that.

18        MR. SOVEN:  May I have one second, please?

19        THE COURT:  You may.

20        (Off the record discussion.)

21   BY MR. SOVEN:

22   Q.    The Government made some mention of Western Union

23   transfers, am I correct?

24   A.    Yes.

25   Q.    And those Western Union transfers were in 1997, is that

23

1   right?

2   A.      I believe a number of them were, yes.

3   Q.      In fact, all of them that I have -- that I've been

4   provided by the Government are all 1997, is that right?

5   A.      I believe so.

6   Q.      About three years before his indictment?

7   A.      Yes.

8           MR. SOVEN:  Your Honor, I have nothing else of this

9   witness.

10          MR. NESCOTT:  Just two.

11          THE COURT:  Mr. Nescott.

12          MR. NESCOTT:  Two follow-ups.

13                          * * * * *

14                   REDIRECT EXAMINATION

15  BY MR. NESCOTT:

16  Q.      Mr. O'Donnell, first of all, the primary obligation for

17  searching for Mr. Ottey after his indictment was delegated

18  first to the FBI and then to the marshals, is that correct?

19  A.      That's correct.

20  Q.      And, secondly, when Mr. Ottey was found ten days ago or

21  so, the circumstances as you understand it -- because what

22  happened here is there's a trooper that made the stop, is that

23  right?

24  A.      That's right.

25  Q.      And that trooper -- you've been talking to the FBI

24

1    agent here, and the FBI agent has been talking to the trooper,

2    and you've all been comparing notes as to what you understand

3    happened, is that right?

4    A.    That's correct.

5    Q.    And at this point it is your understanding there was

6    not really a report of that.  There was a traffic stop,

7    Mr. Ottey was found to be who he is and was turned over to the

8    marshals down there, is that accurate?

9    A.    That's accurate.

10   Q.    All right.  When the car was stopped in which Mr. Ottey

11   was a passenger ten days ago, the driver was not permitted to

12   operate -- didn't have a license, so was arrested or something

13   like that, couldn't drive that car anymore, is that right?

14             MR. SOVEN:  Excuse me, objection.  He's leading the

15   witness.

16   BY MR. NESCOTT:

17   A.    I believe that the -- the driver of the vehicle's

18   license had been suspended.

19   Q.    Okay.  And then Mr. Ottey was asked whether he could

20   drive the vehicle and whether he had any --

21             MR. SOVEN:  Objection, leading the witness.

22             THE COURT:  Try to rephrase.

23   BY MR. NESCOTT:

24   Q.    What was Mr. Ottey asked, as you understand it, at that

25   point?

1  A.     I believe he was asked to identify himself.

2           MR. SOVEN:  Objection as to, I believe, speculative.

3           MR. NESCOTT:  It's a detention hearing.

4           THE COURT:  I agree; I'll let him answer.

5           MR. SOVEN:  I'm sorry, I was being too ambitious.

6           THE COURT:  That's all right.

7  BY MR. NESCOTT:

8  A.     He was asked to provide his name, and I believe he did

9  provide his name; and he was asked to provide, I guess,

10 another identifier, and he provided a Social Security number,

11 I believe.

12 Q.     Was he able to provide any identification of any other

13 kind on a piece of paper?

14 A.     Not to my knowledge.

15          MR. NESCOTT:  Thank you, I have nothing else.

16          THE COURT:  Mr. Soven?

17          MR. SOVEN:  Nothing else of the witness.

18          THE COURT:  Agent O'Donnell, let me ask the obvious

19 question:  Do you have any evidence for this Court that

20 Mr. Ottey knew that there was a warrant out for his arrest?

21          THE WITNESS:  Your Honor, we had -- you know, all

22 the targets in Los Angeles that were involved in this

23 conspiracy were arrested.  They were all close associates of

24 his.  The courier was arrested.  He witnessed that arrest.

25 He -- his cousin who was an associate of his and involved in

1  this conspiracy was -- fled on bail.  He -- you know, he was

2  in the company of a known fugitive and involved in the same

3  conspiracy to traffic cocaine here to the western district.

4            THE COURT:  Thank you.

5            Anything else from counsel?

6            MR. NESCOTT:  No, Your Honor.

7            THE COURT:  Nothing.

8            Mr. Soven, any other questions?

9            MR. SOVEN:  Of this officer, no.

10           THE COURT:  Yes.

11           MR. SOVEN:  No, I do not.

12           THE COURT:  All right, okay.

13           Thanks, Agent, you're excused.

14           (Whereupon, the witness was excused.)

15           MR. NESCOTT:  Your Honor, the Government -- the

16  Court, of course, has the Pretrial Services report and

17  recommendation.  The Government has no further evidence to

18  present at this time.

19           THE COURT:  All right.

20           Mr. Soven?  Do you have any testimony or evidence

21  for the Court?

22           MR. SOVEN:  What I have, Your Honor, to rebut the

23  presumption --

24           THE COURT:  Yes.

25           MR. SOVEN:  -- is present in court are these three

1  young ladies.  One is Winsome Cousley, who is his cousin, who

2  resides in Baltimore, Maryland, at 6998 Clover Hill Road,

3  where he has been living with -- who he has been living with

4  for the last two years.

5          She is prepared to be his custodian and vouching for

6  him, be responsible for him, and comply with any conditions of

7  curfew that the Court would enter.  The home that she lives in

8  is owned by her mother, which is Mr. Ottey's mother's sister,

9  his aunt.  She lives in Brooklyn, New York, but she owns the

10 home in Maryland.  She is present.

11         I guess that young lady sitting over there, to our

12 left, her name is Lena Cousley.  Lena is prepared to put up

13 her house, which is almost everything she owns in the world.

14         THE COURT:  The home in Baltimore.

15         MR. SOVEN:  The home in Baltimore.

16         Also sitting on the far right is his cousin, who

17 lives in the outskirts of Atlanta, Georgia.  Her name is

18 Rose Allen Hamilton; Allen is A-L-L-E-N.  And she lives at

19 50 Thornberry Way in Covington.  She owns a home in her name.

20 She's willing to put up her home to secure the bond condition.

21         His girlfriend, who has been his girlfriend with --

22 on and off for fifteen years, who has been with him for the

23 last two years, would have been willing to be his custodian.

24 However -- her name is Green, Sophia Green.  But the reason

25 why she can't be here is that she is in the United States Army

1    and last week or two weeks ago was just shipped to Kuwait, so

2    she's now on active duty.

3             With respect to his family, he has a brother who

4    lives also in the Baltimore, Maryland, area, who is a doctor,

5    an internist.  His brother's wife is a doctor, and they own a

6    home and they live in Baltimore.

7             He has a brother who lives in Baltimore also that

8    transports medical supplies that you don't want to touch from

9    hospital to the laboratory.  The brother's name is Michael

10   Ottey, O-T-T-E-Y.

11            His other brother's name is Colin Ottey, C-O-L-I-N.

12            His mother, who couldn't come here today because

13   she's too ill and cannot walk, lives now in Orlando, Florida.

14   I spoke to her.  She wanted to be here, but she just couldn't.

15   And that is with respect to overcoming the presumption under

16   the detention statute.

17            May I have a second?

18            THE COURT:  Yes.

19            (Off the record discussion.)

20            MR. SOVEN:  May it please the Court, I have no

21   witnesses to testify other than having these young ladies

22   willing, should the Court agree to a bond and find there are

23   some conditions of release that would satisfy the Court,

24   insure his presence in court, other than that I have no

25   witnesses; but I would like, when the time is appropriate, to

1  make an argument for the reasons why there are conditions that

2  would satisfy the Court to guarantee his appearance.

3          THE COURT:  Well, obviously, the Government, as

4  we've all recognized, has a presumption for detention.  The

5  burden then shifts to you to produce the evidence; so why

6  don't you make argument now and then I'll have Mr. Nescott

7  respond.

8          MR. NESCOTT:  Your Honor, before argument, there has

9  been a proffer of Winsome Cousley's testimony.  I would like

10  to call her as on cross.

11          THE COURT:  Absolutely you may do so.

12          MR. NESCOTT:  Winsome Cousley.

13                    * * * * *

14          WINSOME COUSLEY, a witness herein, having been first

15  duly sworn, was examined and testified as follows:

16                    CROSS EXAMINATION

17  BY MR. NESCOTT:

18  Q.    Miss Cousley, where are you living at the present time?

19  A.    6998 Clover Hill Road; that's in Baltimore, Maryland.

20  Q.    And how long have you lived there?

21  A.    I've lived there for about four years.

22  Q.    And Wayne Ottey is your cousin?

23  A.    Yes.

24  Q.    First cousin?

25  A.    Yes.

1  Q.     Now, how -- when is it that he moved in with you?

2  A.     About two years now.

3  Q.     Okay.  And does he pay rent?

4  A.     Well, he pitch in every now and then.  Not that much.

5  Q.     All right.  And in the last year -- he would have been

6  there every day of the last year?

7  A.     Yes.

8  Q.     For the most part?

9  A.     Yes.

10 Q.     The last two years he's basically there all the time?

11 A.     Yes.

12 Q.     Does he work?

13 A.     He does a little bit construction.

14 Q.     Who does he work for?

15 A.     Armando -- he like goes out with them, Armando, and

16 helps -- like they build houses.  As a matter of fact, they

17 did the basement together, so --

18 Q.     And did he -- does he have a record business as well?

19 A.     Oh, no; he's just a contractor.

20 Q.     Okay.  So the last two years you haven't been

21 involved -- you haven't been aware of any involvement that

22 Wayne Ottey has had with a record business?

23 A.     No, sir, just trying to get back his foot into it.

24 Q.     And during the period of two years he's been living

25 with you, did you know him to use any other names?

1  A.     No, sir.

2  Q.     And did he receive mail at your home?

3  A.     No, none.

4  Q.     And before he came to live with you about two years

5  ago, where was he last living?

6  A.     Oh, that I can't recall.

7  Q.     And in the last two years, to your knowledge, did you

8  travel anywhere with him?

9  A.     Sure.  We've been to New York together.

10  Q.     Out of the country?

11  A.     No.

12  Q.     To your knowledge, in the last two years has he

13  traveled out of the country?

14  A.     Not -- not -- not -- not -- I'm not aware of.

15            MR. NESCOTT:  I have no further questions.  Thank

16  you.

17            THE COURT:  Mr. Soven.

18                    * * * * *

19                REDIRECT EXAMINATION

20  BY MR. SOVEN:

21  Q.     What do you do for a living?

22  A.     Oh, I'm studying for LPN, but I'm a certified nurse

23  assistant now.

24  Q.     How long have you been doing that?

25  A.     Ooh.  About sixteen, eighteen years; could be twenty.

1 Q. What school do you attend?

2 A. HMI.

3 Q. Where is that?

4 A. Eastern Avenue in D.C., Northeast, Washington, D.C.

5 Q. Does anyone else live at the house with you and Wayne?

6 A. Yes, my sister, my older sister.

7 Q. What is her name?

8 A. Athea Cousley.

9 Q. What does she do?

10 A. She stays home.  She used to go to a day school because

11 she's handicapped, so she's -- she has a disability.

12 Q. She does.

13 A. Yes.

14 Q. And do you care for her also?

15 A. Yes.

16 Q. And she has been living for the last two years also

17 with you and with Wayne?

18 A. Correct.

19   MR. SOVEN:  Thank you very much.  I have nothing

20 else.

21   THE COURT:  Miss Cousley, do you work now?

22   THE WITNESS:  Yes, ma'am.

23   THE COURT:  What are your hours generally?

24   THE WITNESS:  My hours are from 3 to 11.

25   THE COURT:  Five days a week.

```
 1              THE WITNESS:  Yes, ma'am.
 2              THE COURT:  And your sister who is handicapped,
 3    what -- how functional is she?  Is she able to get up, walk
 4    around?
 5              THE WITNESS:  Yeah, she walks around.
 6              THE COURT:  Can you tell me what her handicap is?
 7              THE WITNESS:  Her whole left side is paralyzed.
 8              THE COURT:  But she can ambulate on her own.
 9              THE WITNESS:  Yes.
10              THE COURT:  Okay.  How old is she about?
11              THE WITNESS:  She's a year older than me, so she's
12    going to be 40 this year, as a matter of fact.
13              THE COURT:  Does she have any mental disability?
14              THE WITNESS:  Maybe she forgets every now and then,
15    but that's it.
16              THE COURT:  Okay.
17              Any other questions?
18              MR. NESCOTT:  None, Your Honor, thank you.
19              THE COURT:  Thank you, Miss Cousley.  You're
20    excused.
21              (Whereupon, the witness was excused.)
22              THE COURT:  Would you like to cross examine any of
23    the other witnesses?
24              MR. NESCOTT:  No, Your Honor, thank you.
25              THE COURT:  All right.
```

1          Mr. Soven?

2          MR. SOVEN:  Yes, Your Honor.

3          THE COURT:  Would you like to make argument?

4          MR. SOVEN:  I would, thank you.  I appreciate the

5     opportunity.

6          It appears that the Government is moving for this

7     pretrial detention on the theory of flight risk.  Clearly,

8     there is insufficient or no evidence at all that Wayne Ottey,

9     when he left to go home to live at his mother's home in

10    England, was fleeing the jurisdiction.  He left months before

11    the indictment was filed.

12         There is no evidence from the Government's own

13    witness that he knew that there was a warrant and that -- for

14    him.  There's no evidence he was a fugitive.  He lived in

15    England openly.  He lived in England in his mother's house and

16    that address the Government was aware of; and used the

17    Government's services, Government loan, gas bill, electric

18    bill.  And the Government never bothered to call up the

19    authorities and ask them to knock on the door.

20         When he was arrested, he did not conceal his

21    identity or hide his whereabouts.  Not only did he give his

22    name, he gave his middle name and Social Security number, all

23    of which was true.  He was not found with any documents

24    showing any aliases or any attempts to hide his name.  He

25    didn't have great sums of money on him.  He had, in fact, $63,

1  nothing else.  He had no drugs on him.

2          He has never been arrested for a crime in this

3  country or any country.  He has never served any time in jail.

4          He has a very close family, for the most part, that

5  live in Baltimore, Maryland; his two brothers, his cousin, who

6  he lives with in a home that's owned by his mother's sister,

7  who has come to court today from Brooklyn and traveled here,

8  flown here to tell the Court that she's willing to put up her

9  house.

10          His cousin has flown here from Atlanta to tell the

11  Court she is willing to put up her house.  His cousin who

12  testified who is a nurse and taking care of her sister is

13  willing to be his custodian.

14          He has -- he works, although he's getting paid cash,

15  for a construction company, Armando Construction.  He also has

16  been working and getting $1300 a month in salary.  He doesn't

17  have a lot of money.  He has no house, no car, no assets, no

18  property in his name, nothing.

19          I haven't been hired yet.  I don't know if I will

20  be; and the family have all chipped in to ask me to be here

21  today just for this hearing.

22          But the question, the most important question to be

23  answered is:  Was he intentionally a fugitive?  Was he

24  avoiding -- avoiding arrest?  And there's no evidence that he

25  intentionally evaded arrest, none.

1          In fact, his children's mother, when asked by

2     agents, FBI agents or some law enforcement agents, back at the

3     time of the indictment said he was in England.  The Government

4     had the address.

5          The Court asked and did not get an answer; there is

6     no evidence that he knew there was a warrant for his arrest.

7     He has no means to escape to any other country.  He has a

8     passport which his aunt has, and she's prepared to, as a

9     condition of his bond, to turn over the passport to the Court.

10    He has no incentive to flee.  His aunt is putting up

11    everything she owns.

12         I would ask the Court and suggest the following

13    bond:  That Wayne Ottey be released on a one hundred thousand

14    dollar bond, personal surety bond; that it be secured by real

15    property, the two pieces of real property which is in Atlanta

16    and in Baltimore; that there also be a hundred thousand dollar

17    unsecured bond signed by his Aunt Lena and by his cousin who

18    he lives with; that he be released to the custody, as

19    custodian, to his cousin or to anyone else that the

20    United States Government or Pretrial Services approves; that

21    curfew be set by the Court or by Pretrial; that he surrender

22    his passports; that he have no travel outside of Baltimore,

23    Maryland, without previous approval by the Court and, of

24    course, to come here.

25         The Government under Section 3142 of the US Code

1   has -- has not given the Court sufficient cause that he is a

2   flight risk, and I would ask that you allow him to be

3   released, and that those conditions would reasonably assure

4   his appearance in court.

5           Thank you, Judge.

6           THE COURT:  Thank you.

7           Mr. Nescott?

8           MR. NESCOTT:  Thank you, Your Honor.

9           This is a very interesting case because defense is

10  arguing:  Well, we can't show that he knew about the

11  indictment, that he was wanted, so he wasn't really fleeing.

12  But in arguing that, defense is asking you to forget about

13  what's occurred in the years immediately prior to that as far

14  as false IDs and the very serious activities that were going

15  on according to the proffer.

16          The Defendant in this case is a British citizen.

17  The Defendant in this case says, through his cousin, he's been

18  living with her for the last two years; and she, however, says

19  well, no, he didn't receive mail there; and, no, I don't know

20  where he was living before two years ago, which really is the

21  question here.

22          You know, there are reports of sightings of him in

23  England or out of the area or where he had gone, no one is

24  really quite sure, but we can look at the history of what went

25  on for a decade before and try to determine whether or not he

1    is a risk of flight.

2           As the Court well knows, under the detention

3    statute, there are four areas for the Court to consider, the

4    first being the nature of the charges, the strength of the

5    case, and the Court knows that this does involve cocaine,

6    crack cocaine.  The Court has heard that it is -- the Court

7    knows that that's a crime that carries a ten year maximum or

8    more.  Indeed, here it carries a ten year mandatory minimum if

9    five kilos or more are proven; and I would suggest to the

10   Court that that is a very real consideration in risk of

11   flight.

12          Mr. Soven argued that what motive does he have to

13   flee?  Well, the motive is very clear.  If convicted on this,

14   he's looking at least at ten years or more.

15          But apart from that, Your Honor, as far as the

16   strength of the case, the Court can see that this involved

17   many kilograms of cocaine.  It involved a period of conduct

18   over a period of months and years.  It involved the actual

19   seizure of five kilograms of cocaine at BWI Airport; and

20   according to the proffer, that seizure occurring in December

21   of 1999.  That seizure followed a trip made by Brandant Green

22   and the courier from California.

23          But the Defendant is proffering:  I wasn't even in

24   America at that point.  I went back to England in November of

25   1999.

1    Now, of course, the other problem is, Your Honor, if

2    he indeed went back to England in '99, there are no records

3    showing that he ever re-entered this country in '99 or 2000 or

4    who knows when, and who knows where he has been.  And that --

5    indeed, if this were a case where there's no indication of

6    false IDs being used -- maybe that's not so important, but I

7    would suggest to the Court that the Court has before it the

8    Illinois driver's license which was applied for in late

9    October of 1999.

10    According to the proffer, shortly after the

11    Defendant was caught at JFK, a hundred thousand dollars was

12    taken from him by agents.  Shortly after that, he comes up

13    with this ID.  The photo here has been identified as

14    Wayne Ottey by various individuals; and it says he lives in

15    Chicago, Illinois.  And then he starts traveling with a

16    courier under this name, and he makes hotel reservations and

17    stays at a hotel in California under this name.

18    And even before then he was no stranger to false

19    IDs, false names.  Why in sending a money order would you use

20    a false name?  And, indeed, you have the three pictures on the

21    money -- on the wire transfers with -- one is Wayne Ottey, one

22    is Wayne Brown, and one is Wayne McCutcheon.  Again, the

23    Defendant is experienced at using false IDs.

24    The Government cannot show where he has been these

25    past years, but just the fact that we cannot show that does

1  not mean the Court should release him on bond at this point.

2          The first two prongs, the nature of the charges and

3  the strength of the case, are there for the Court to consider.

4  I would consider the strength of the case is, in fact, very

5  strong based upon the testimony of multiple witnesses, the

6  statements, testimony offered through the agent.

7          The third factor, as the Court well knows, is the

8  character of the Defendant.  The Defendant told Pretrial

9  Services, oh, yes, he's a record promoter.  Well, his cousin

10 said:  I don't know anything about any record company at this

11 point, during the two years he's lived with her; and the

12 Defendant has paid -- says he's being paid cash to work some

13 job, but there's really no other support for that.

14          The -- well, in any case, as to that prong, a

15 personal history characteristic, the Defendant has moved

16 around a lot, has used multiple IDs; the Government would

17 suggest he is a very real risk of flight.

18          Additionally, the Pretrial Services's recommendation

19 is before the Court, and Pretrial recommends for all these

20 factors he should be detained as well, and I would suggest to

21 the Court that that is what should be done in this case.

22          THE COURT:  Thank you, Mr. Nescott.

23          The Government does have in this case a rebuttable

24 presumption that no condition or combination of conditions

25 would reasonably insure the appearance -- the safety of the

1    community and that the Defendant would not flee.

2            The burden then shifted to the Defendant to produce

3    some credible evidence for the basis for his contention he

4    will appear and not pose a threat to the community.  The

5    Third Circuit has characterized this burden to be relatively

6    light and easy to meet; and I think that the fact that the

7    family is here, willing to act as custodian and also to post

8    two pieces of property does for me shift the burden back to

9    the Government to prove by clear and convincing evidence that

10   he poses a danger to the community or by a preponderance of

11   the evidence that he's a flight risk.

12           I would agree with counsel for the Government that

13   the weight of the evidence against Mr. Ottey is very strong;

14   and, obviously, the case is a crime that involves narcotics.

15   On the other hand, the history and characteristics of the

16   accused is another factor that I have to consider.

17           He has no record, either before or after this

18   offense.  Family ties is something that I am mandated to

19   consider by the Bail Reform Act, and we have people who have

20   flown here from -- at great distance and at great expense to

21   stand up for Mr. Ottey in a sense and post their property, and

22   I must admit that I am swayed by that.  Were they not here, I

23   think I would agree with the Government's contention that he

24   would have the means to flee if he so desired.

25           There is evidence that he has used some false IDs,

1   but those -- that evidence appears to all be at least before

2   the year 2000, and there really isn't a whole lot of evidence

3   that efforts were made to find him or to serve him with the

4   arrest warrant.  I'm not sure whether he should have called

5   and turned himself in on the chance that there was an arrest

6   warrant, but at least I don't have the evidence that a great

7   effort was made to locate him and that he actively fled from

8   service of the warrant.

9          He wasn't on probation or parole at the time of the

10  offense charged.

11         And I do think that there are conditions, at least

12  that have been offered, that can reasonably assure his

13  appearance, being those proposed by counsel relative to the

14  real property bond, his cousin has offered to be a custodian.

15         If I were to grant release, I would want electronic

16  monitoring and home detention which would allow Mr. Ottey to

17  leave for work, religious things, education, meeting with

18  counsel, those kind of things, but only preapproved by

19  Pretrial Services.

20         The one problem that I have, however, is that I'm

21  sure that our Pretrial Services has not had a chance to look

22  into whether or not Miss Cousley could be a suitable third

23  party custodian.  You know, who really owns the property, what

24  it's value is; and I -- before I make a final decision, I'd

25  like to give them an opportunity -- or maybe the Baltimore

43

1   Pretrial Services Office some opportunity to look into the

2   suitability of the offered third party custodian and also the

3   property issue.

4           So what I would state right now is I'm not going to

5   rule.  I'm going to allow my order to stand of temporary

6   detention.

7           How long do you all think it would take you to

8   investigate this further?

9           PRETRIAL SERVICES:  Well, I do have --

10          THE COURT:  Could we do it by next week?

11          PRETRIAL SERVICES:  Yes.  Next --

12          MR. SOVEN:  Your Honor, would it help any -- they're

13  here today, and they have all their paperwork, the deed, the

14  title, the tax deed --

15          THE COURT:  That would help, and I think we'll need

16  to do a background check or a criminal records check on

17  Ms. Cousley.

18          MR. SOVEN:  Would that help to start get the ball

19  rolling?

20          THE COURT:  You think you could get maybe a

21  supplemental report to me by when?

22          PRETRIAL SERVICES:  Monday afternoon.

23          THE COURT:  Okay, that would be fine.

24          I'm going to just withhold my order; but assuming

25  that Pretrial Services confirms all of this and all the

44

1  testimony that's been offered and Miss Cousley is a suitable

2  third party custodian, what I would consider would be the

3  bonds that you have mentioned, a hundred thousand secured,

4  naming the custodian, electronic monitoring, home detention,

5  you know, give up the passport, no firearms, no drugs, the

6  standard conditions, and then obviously not being allowed to

7  travel other than to here for the -- any court appearances

8  that he may have and anything else the Government might want

9  to suggest.

10           So I'm going to just hold off; and as soon as I hear

11  from you, I'll enter the appropriate order.

12           Is there anything else anyone wants to put on the

13  record?

14           MR. NESCOTT:  Nothing, Your Honor.

15           MR. DIETZ:  Your Honor, one thing.  Speaking with

16  Mr. Nescott, I don't believe he has an objection to unsealing

17  this entire case.  I would ask the Court if the Court could

18  enter an order.  I notice we did mention the name of the other

19  Defendant, but that's fine with me; it's really up to the

20  Government.

21           MR. NESCOTT:  Yes, I don't think it's any secret.  I

22  think when it was partially sealed in an earlier proceeding

23  the name was mentioned accidentally by the Court.

24           THE COURT:  Sorry.

25           MR. NESCOTT:  So the Defendant knows, so I think --

45

1    we'll file a motion to unseal the entire document.

2            MR. DIETZ:  Just for ease of filing as well, makes

3    it a lot easier to file.

4            THE COURT:  All right.

5            MR. DIETZ:  Thank you, Judge.

6            THE COURT:  We are adjourned.

7            (Whereupon, at 12:30 p.m., court was adjourned.)

8                          *  *  *  *  *

9                      C E R T I F I C A T E

10           I, Shirley Ann Hall, certify that the foregoing

11   is a correct transcript from the record of proceedings in the

12   above-titled matter.

13                      s/Shirley Ann Hall
                        Shirley Ann Hall, RDR, CRR
14                      Official Reporter

15

16

17

18

19

20

21

22

23

24

25